SCHNEIDER *v.* C. H. LITTLE CO.

1. NEGLIGENCE—CONTRACTORS — BUILDING CONTRACTS—MASTER AND SERVANT—PERSONAL INJURIES.

Where plaintiff was in the employ of the contracting mason engaged in the construction of a portion of a dwelling house, and was injured by the collapse of a platform or floor upon which defendant's servant placed, during the absence of the plastering contractor, a large quantity of plaster, disobeying the order and direction of the architect, and it appeared that the architect was present at the building at the time the plaster was delivered and that the driver obtained directions from him where to place the sacks of material, and that it was the custom among building trades that the architect should give instructions where materials should be delivered, but the

architect did not remain to see whether his instructions were obeyed, the question of the defendant's negligence depended on whether its agent omitted to do what an ordinarily prudent man should.

2. SAME—SALES—DELIVERY.

Where the plaster was placed in the building at the disposal of the plastering contractor who had purchased it, the seller had done all that was necessary to put the goods unconditionally at the disposal of the buyer, and delivery was complete.

3. REASONABLE CARE—INSTRUCTIONS.

Whether the agent of defendant was guilty of negligence was a question of fact, also whether he understood or ought to have understood that by piling five tons of plaster in the unfinished structure he was creating a danger or a nuisance likely to give rise to the results which followed.

4. SAME—SALES—DELIVERY OF GOODS.

Where delivery is undertaken by the seller and he is advised that the disposition of the goods in a certain way at the place of delivery is dangerous to the structure in which they are placed and another disposition is safe, his duty to prevent harm is clear, and the obligation would rest upon any person, having knowledge of the unsafe condition created and the probable consequences, to prevent the injury.

5. SAME—CONTRACTORS.

The fact that the plastering contractor had received the goods which had been placed at his disposal did not affect or relieve the defendant of the duty to exercise reasonable care, nor excuse his original misfeasance in the absence of evidence that the contractor should undertake to do the plastering, knew about the condition which was created, or had reasonable grounds for apprehension would be created, the court erred in taking the case from the jury.

Error to Wayne; Codd, J. Submitted October 15, 1914. (Docket No. 66.) Decided March 17, 1915.

Case by Charles W. Schneider against C. H. Little Company, a Michigan corporation, for personal in-

juries. Judgment for defendant upon a directed verdict. Plaintiff brings error. Reversed.

*George F. & Peter J. Monaghan,* for appellant.

*Stevenson, Carpenter, Butzel & Backus* (*Thomas G. Long,* of counsel), for appellee.

A statement of the facts (of what the testimony for plaintiff tended to prove) is taken from appellant's brief, substantially as it there appears: The plaintiff is 50 years old, and has been engaged in the occupation of a tile setter for several years past. About five years before the happening of this accident, he entered the employ of C. J. Netting Company. This concern is engaged in the mantel and tile contracting business and specializes, among other things, in the laying of tile floors. At the time of the events to be related, C. J. Netting Company had a contract to lay the tile floor upon the porch of a dwelling house under course of construction on Burns avenue, in Detroit. The owner had made several distinct and separate contracts for the erection of this building. Gustave Johnke was the plastering contractor. Otto Misch was the mason contractor. Other contracts were made, which are not of interest in this issue. The plans and specifications for the building were drawn by Bernard C. Wetzell, who had charge of the execution of the plans and superintended the construction of the building. The dwelling was of brick and cement construction. In front of the building a porch was designed, 9 feet in depth and 35 feet in length. The floor of the porch was constructed of reinforced concrete. The cellar was built underneath the main portion of the house, but not under the porch itself. The porch was joined directly to the main front wall of the building, excepting at that portion of the building described as

the "bay window." The bay window, a part of the living room, was designed to extend beyond the main wall and over and upon the porch itself. The inside dimensions of this bay window were 2 feet in depth and 14 feet in length. The bay window extended and projected about 2½ feet beyond the line of the wall of the building and over and upon the porch, resting partly upon the wall and partly upon the porch floor. The openings in the window itself were about 20 inches above the floor of the porch. The porch floor was designed to sustain 75 pounds to the square foot.

On the day after the plaintiff started work, namely, on the 17th of August, 1910, about 9 o'clock in the morning, a wagon belonging to C. H. Little Company drove to the front of this building with a load of plaster. This plaster was contained in bags, each weighing 100 pounds, and was being delivered by C. H. Little Company upon the order of Gustave Johnke. The driver of the wagon came up to the porch where the plaintiff was working and said, "I have a load of plaster for you;" and the plaintiff replied, "It isn't for me." The teamster said, "What shall I do with it?" and the plaintiff said: "I don't know. It is not for me. There is the architect over there, go and see him, and he will tell you." The architect was present at the building and performing his work of superintendence. The driver went into the building and spoke to the architect. The driver then came from the building, drove the wagon up close to the porch, took a plank about 12 feet in length, and placed it from his wagon to the porch. He then started to carry the bags from the wagon across the porch and placed them in the bay window in front of the building. This operation interfered with the work of the plaintiff, and he said to the driver of the wagon, "You are in my way; you are interfering with my work. You will have to find another way

to get in." Up to this time the driver had placed about 15 bags of plaster in the bay window. The driver of the wagon then changed the location of his wagon and brought the bags of plaster through the side of the building, through the rooms in the rear of the living room, and placed the remaining bags of plaster on the floor of the living room and on the floor of the bay window. While the driver was bringing the plaster through the side of the building and into the living room, and placing it in the bay window, Paul Shefskowski, an employee of Otto Misch, the mason contractor, said to him:

"*A.* I told him when he was about unloaded why he should not put so much, so many bags there, that the joists might break and the floor might break and kill us all.

"*Q.* What did he say?

"*A.* Nothing.

"*Q.* Did he put the whole wagon load in the bay window?

"*A.* He did."

Mr. Wetzell testified:

"*A.* I was standing about the middle of the building when this man came up and asked me where to put the plaster, and I told him to distribute it around the building and not to pile any more into the bay window. He said, 'That is the most convenient place to put it.' There were already some bags of plaster placed in the bay window.

"*Q.* About how many?

"*A.* Ten or 15 bags, which brought it up about the level of the window sill.

"*Q.* State whether or not you said anything to him about why he should not place it in the bay window.

"*A.* Not to place it in the bay window because it was dangerous to pile material all in one place; we do that in every building."

When the material was delivered at the building, Mr. Johnke was not present. In the absence of the contractor, it is the custom among building trades

for the architect to instruct where material is to be delivered. There is nothing in the record to indicate that Mr. Johnke had left any instructions as to the location where this plaster was to be placed, or to show that Mr. Johnke was present at the building between the time the material was furnished and the accident. The total weight of the plaster amounted to over 10,000 pounds. About 4 o'clock the porch, by reason of the excessive weight bearing upon it, collapsed. The plaintiff was then working about the center of the bay window. One of the window sills from the bay window and many of the bags of plaster piled up within the bay window fell upon the plaintiff. The stone sill of the porch and the bags of plaster pinned him down and he was unable to free himself. He suffered severe injuries, from which he has not as yet recovered.

To this statement I add the following: The architect did not remain to see whether his instruction, or suggestion, was obeyed. A number of men were at work about the building, to some of whom, at least, the presence of the plaster was no indication of danger. They so testify. The size of the bags of plaster is given as about 2½ feet long and 18 inches wide, and they were piled 4½ to 5 feet high. There were 100, or more, of them. It does not appear that the wall of the house or the floor of the room, inside the bay window, broke or changed position. There was a rough board floor in the room and in the bay window. The material was perishable, needing protection from the action of water.

After the plaster was delivered, and to the time when the porch collapsed, the plaintiff added gradually, but considerably, to the weight of the porch by laying wet cement and tiles on the floor thereof. No warning, as from breaking or deteriorating material, announced or preceded the collapse of the porch.

No testimony was introduced on the part of defendant. Verdict for defendant was directed, and judgment entered thereon. Two general propositions are presented in argument, one that:

"The defendant company owed the duty to the plaintiff to refrain from creating a dangerous condition, and its action in placing the plaster in one position constituted actionable negligence."

The other that:

"The defendant company is not entitled to immunity from the result of its negligent act because another agency did not actively intervene to render safe a condition which the defendant company had made unsafe."

For the defendant, appellee, it is argued that there was no actionable negligence in the piling of the plaster and that:

"The failure of the plastering contractor to change the position of the plaster was an intervening cause and the effective legal cause of the injury."

OSTRANDER, J. (*after stating the facts*). 1. As completing a sale and delivery of personal property, it is the general rule that when, pursuant to the express or the implied agreement between seller and buyer, the seller has done everything which is necessary to be done to put the goods completely and unconditionally at the disposal of the buyer, the delivery is complete. It is a necessary inference from the facts stated that, according to an understanding or agreement of buyer and seller, the plaster was to be delivered at the building where it was delivered and placed in or about it in a place sheltered from rain. The facts support the conclusion that for some five or six hours before the porch collapsed the plaster was completely and unconditionally at the disposal of Johnke, the buyer.

It may be assumed that defendant's agent did not intend by his conduct in delivering the plaster to cause harm. Whether he was negligent depends upon whether he omitted to do something which a reasonable man, guided by consideration which ordinarily regulate the conduct of human affairs, would do, or did something which a prudent and reasonable man would not do.

"Now, a reasonable man can be guided only by a reasonable estimate of probabilities. If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things. This being the standard, it follows that, if in a particular case (not being within certain special and more stringent rules) the harm complained of is not such as a reasonable man in the defendant's place should have foreseen as likely to happen, there is no wrong and no liability." Webb's Pollock on Torts, p. 45.

The case, as to the negligence of defendant's agent, is not within special rules, as, for example, it would be if a statute duty had been violated. A jury might find that any man in the business of delivering building material ought to know that it is probably dangerous to pile five tons and more of material, as heavy as plaster, in one pile, in an unfinished dwelling, and that he should have been instructed by his employer not to do so. Defendant's agent was advised, by one having some authority, to whom he had been referred for direction, that such a course was dangerous—told not to put any more in the bay window, but to distribute it. A jury might find that, whether the con-

duct of defendant's agent was otherwise negligent, it was negligent in view of the instruction he received from the architect; that he should then have apprehended, if not before, that from what he was doing, and did, evil consequences would probably result. Whether defendant's agent was negligent was a question for the jury. If he understood, or ought to have understood, that by piling the bags as he did he was, probably, creating a nuisance, inviting the evil results which followed, his conduct was negligent.

2. When delivery of goods is undertaken by the seller, and in delivering them he is advised that disposition of the goods in a certain way, at the place of delivery, is dangerous to the structure in which they are placed, and, impliedly, that another disposition is safe, and the delivery is thereafter completed, must the buyer, at his peril, inspect the manner of delivery and disposition of the goods at once, or in any particular time? If the buyer knows of the improper disposition, his duty to prevent harm is clear. And it would seem it would be the duty of any one having knowledge of the unsafe condition created, and the consequences to be apprehended, and who was likely to be affected thereby, to prevent the injury. Preventive action, in view of the precedent negligent conduct of another, is a duty when the negligent conduct is known, or evil effects from known conduct are to be apprehended. As stated in the brief for appellee, from 29 Cyc. p. 502, the principle invoked is:

"Where, after the negligent act, a duty devolves on another person in reference to such act or condition which such person fails to perform, such failure is the proximate cause of the injury resulting from the act."

In its last analysis, the argument of appellee is this: That Johnke owed to plaintiff the duty to ascertain, within a reasonable time, whether his plaster had been bestowed in delivery in such manner as to affect the

integrity, or the safety, of the structure in which it was placed and the safety of persons lawfully there; that, this duty arising, defendant's original negligent conduct was, in law, excused. The cases cited by appellee do not go so far. In *Fowles* v. *Briggs*, 116 Mich. 425 (74 N. W. 1046, 40 L. R. A. 528, 72 Am. St. Rep. 537), the shipper of lumber which was negligently piled on a car was held not to be liable in damages to the servant of the carrier injured by the movement of the car and lumber after it became the duty of the carrier to provide for the inspection of the car. *Lellis* v. *Railroad Co.*, 124 Mich. 37 (82 N. W. 828, 70 L. R. A. 598), is a case like, and is decided upon the authority of, *Fowles* v. *Briggs*. In *Missouri, etc., R. Co.* v. *Merrill*, 65 Kan. 436 (70 Pac. 358, 59 L. R. A. 711, 93 Am. St. Rep. 287), a railway company which had delivered a defective car to a connecting carrier, after which it was inspected by the receiving carrier, was held not liable in damages to an employee of the latter. In *Griffin* v. *Light & Power Co.*, 128 Mich. 653 (87 N. W. 888, 55 L. R. A. 318, 92 Am. St. Rep. 496), defendant had installed an imperfectly insulated electric lamp on the premises of a customer, who knew of the defect and continued to use the lamp. A third person in using it was injured. It was held that defendant was not liable. In all of these cases, some one other than defendant had assumed a duty which, performed, would have averted the injury, or had done some act which, if properly done, would have averted it. Responsibility for proper conditions had been assumed.

The mutual duties of contractors engaged in performing distinct contracts in the erecting of a building, in receiving and disposing of material, may be somewhat peculiar. It would seem that no one of them might at any time actively disregard the safety of the others and their servants and the duty to so supervise the delivery of material as to bring about no harm

to others might be clear. Whether in any case such a duty exists, and, if it may, the time within which it should be performed, depends upon the facts of the case. In any event, each contractor would still be governed by a reasonable estimate of probabilities. It does not appear that Contractor Johnke knew anything about the condition which was created, or had reason to apprehend that it would be created. Appellee has not made out a case within the governing principle it relies upon. Whether plaintiff was himself negligent is a question not determined by the trial court.

The judgment is reversed, and a new trial granted.

BROOKE, C. J., and MCALVAY, KUHN, BIRD, MOORE, and STEERE, JJ., concurred.